## CLARK & a. v. PICKERING & wife.

The surviving brothers and sisters of one of the children of an intestate, entitled by the statute of February 3, 1789, to the share of such child dying unmarried and under the age of twenty-one years, are the children of the intestate, and no others, to the exclusion of brothers and sisters of the half blood.

Under that statute brothers and sisters of the half blood may with the mother, inherit the estate of a child of the intestate who dies unmarried after attaining the age of twenty-one years.

PETITION FOR PARTITION. Theodore Furber being seized of the property described in the petition, on the 11th day of September 1792, married Mrs. Lydia Folsom who was then a widow, and who had by a former husband one child Dorothy Folsom. Theodore Furber had by this marriage three children, Theodore, M'Lauren, and Lydia. The last named is the wife of Stephen Pickering the defendant. Theodore Furber, the father, died on the 14th day of January 1809, intestate, leaving his wife, Dorothy Folsom, and his three children, alive. Theodore Furber, the son,

Clark *v.* Pickering.

died on the 12th day of May 1813, under the age of twenty-one years and unmarried.

M'Lauren Furber died on the 27th day of July 1818, over the age of twenty-one years and unmarried.

Dorothy Folsom married James Rollins and died on the 13th day of September 1818, leaving seven children: namely, the six petitioners and the mother of Elizabeth Drew the minor named in the petition.

The property in controversy was assigned and set off as and for a part of her dower in the estate of the first named Theodore Furber, to Lydia Furber, who occupied the same until her death on the 4th day of January 1842.

The petitioners claimed to be entitled each to one seventh of one third of the premises, and the parties agreed to submit the question whether they were entitled as alleged, or to one seventh of one fourth part only.

*Emery*, for the petitioners. The only question in the case is, did Mrs. Rollins the half blood inherit from Theodore Furber, who died under twenty-one and unmarried? At common law the half blood was not considered as next of kin to the whole blood, and did not inherit from those of the whole blood. *Cook* v. *Hammond*, 4 Mason 467; *Goodtitle* v. *Newman*, 3 Wils. 526.

After the emigration of our ancestors to this country, English statutes altered the rule of the common law as to personal property. The first was that usually called the statute of distributions. 22 and 23 Car. 2d, ch. 10, secs. 3 and 4; 5th vol. Statutes of the Realm, 719 and 720.

By this statute the mother as well as the father succeeded to all the personal effects of their children, who died intestate without wife or issue, in exclusion of the other sons and daughters, the brothers and sisters of the deceased. And so the law still remains with respect to the father, but with regard to the mother it has been altered by the 1 Jac. 2, chap. 17, sec. 7; 2 Black. Com. 516.

Clark *v.* Pickering.

Under these statutes it has been decided, that a brother or sister of the half blood shall have an equal share with those of the whole blood, if he is in equal degree. 1 Com. Dig. 474, Tit. Administration, H, and cases there cited. In 2 Vern. 124, *Crooke* v. *Watt*, this point arose, and the court said, "this case has been so often adjudged and settled here, that the half blood should have an equal share with the whole blood, that to give a new rule in it now would make great confusion and disturbance in very many families," and decreed a whole share to the half blood. This decree was affirmed by the House of Lords. The following cases in Wentworth on Ex'ors: *Smith's* case 497; *Brown* v. *Wood*, 498–9; and *Tracy* v. *Smith* 509, are to the same effect. (Philadelphia Ed. of W. 1832.)

A posthumous brother of the half blood shall take under the statute a share of his intestate brother's personal estate. 1 Com. Dig. 474, Tit. Administration, H; *Burnet* v. *Mann*, 1 Ves. Sen. 156, is referred to.

The facts of this case are better stated in 7 Eng. Ch. 220, in a note to the case of *Jessopp* v. *Watson*, than they are by Vesey. It is there stated that the claim was made under the statute of James, and by the decision of that case it appears that the half blood inherit directly from the whole blood by virtue of the words brothers and sisters in the statute of James. This case is also that of *Jessopp* v. *Watson*, 1 Mylne & Keene 665 (7 Eng. Ch. 216); in the facts and points decided, we consider it a direct and positive authority in favor of the views of the petitioners in this case.

In granting letters of administration, the half blood is admitted as well as the whole; for they are of the kindred of the intestate, and were formerly excluded from the inheritance of land upon feudal reasons. Wherefore the brother of the half blood shall exclude the uncle of the whole blood. Tomlin's Law Dict. 720, Tit. Ex'or, which

cites 1 Vent. 425. The reason of the exclusion having ceased so has the law.

The provisions of the two English statutes above named, were early enacted in the Province of New-Hampshire in almost the very words of these acts, and made to apply to real as well as personal estate. The act of George I, ch. 73, passed in 1718, is referred to. Laws of New-Hampshire 104, edition of 1771. The preamble, the clause of distribution, and the clause relating to the case where children die under twenty-one and unmarried, are particularly referred to.

The next act is that of February 3d, 1789, which continued in force until 1822. Laws of N. H. 207, edition of 1815. This act was in force at the time of the death of both Theodore the elder and Theodore the younger, and as we contend governs the rule of descent in this case. It has been decided that the words "lands, tenements and hereditaments," in statutes in some respects very similar to ours of 1789, are sufficiently broad to include all rights in real estate; and that the word "seized" is equivalent to the words "owning" or "being entitled to." 4 Mason 467; *Cook* v. *Hammond,* 3 Met. 187; *Russell* v. *Hoar, Adm'r.* And such seemed to be the opinion of our court in *McAffee* v. *Gilmore,* 4 N. H. 391.

We now contend that by the statute of 1789, which equally applies to real and personal estate, no difference whatever exists between the half and the whole blood· That the words brothers and sisters in this act are to receive the same construction that has been put upon those words in the act of 1st Jac. 2, chap. 17, sec. 7, this act being in all essential particulars copied from the acts of Charles and James. The only difference is, where a child dies after his father under twenty-one and unmarried, the mother is excluded from any share in such deceased child's estate; but if he be over twenty-one, she has a share with every brother and sister. The legislature did

not intend to make any other alteration; and the reason for this alteration is to be found in the preamble to the act of 1718, namely, the services of the younger children to their parent. If the legislature had intended that the share of one dying under twenty-one and unmarried should be distributed precisely as though the child had died before its father, they would have said so in plain language, and not have left it to be inferred from this (if that be the construction) doubtful and ambiguous language; if the language is so plain that the intention of the legislature can be easily gathered from it, the court ought not to seek for other intentions by strained constructions of statutes. The exclusion of the mother entirely where the child dies under twenty-one and unmarried, is a sufficient reason for the alteration in the language, and by considering this as the only reason, all parts of the statute are made consistent with each other, and force is given to every part of it.

This view of this statute is not without the authority of a sanction of learned opinion. Judge Kent says, " in Maine, New-Hampshire, &c., there seems to be no distinction left between the whole and the half blood. They are equally of the blood of the intestate. He says, in some of the States, there is a distinction between the estates acquired by descent and those of purchase; the former pass to the kindred who are of the blood of the ancestor from whom it came, the latter to those of the half blood as well as those of the whole blood. But this distinction appears not to exist in New-Hampshire, but the estate descends in the same path of descent whether it came from the paternal or maternal ancestor, or was acquired by purchase." 4 Kent's Com. 403, 404, 405.

A case in North-Carolina, *Seville v. Whedb*, 1 Dev. 160, decided that a paternal half brother was entitled, as heir to his half brother, to an estate which descended to that deceased brother, *ex parte materna*.

Clark *v.* Pickering.

In the case of *Gardner* v. *Collins*, 3 Mason 403, which was a writ of entry, the plaintiff claimed as heir to a brother and sister of the half blood to him, both of whom died during their minority. The case arose in Rhode-Island. The words of the statute of that State are, "if there be no father, then to the mother, brother, and sisters, of such intestate, or such of them as there may be," &c. The plaintiff recovered. The case was transferred to the Supreme Court of the United States, and there decided in the same way. The observations of *Story*, J., in this case, are in point. See 2 Pet. 58.

Where an individual died intestate, and had no relations in the direct line of ascent or descent, and her nearest collateral relatives were an aunt of the half blood of the intestate's father, and another aunt of the full blood on the side of the mother; held that the two aunts were entitled to share equally in the distribution of the intestate's personal estate. The court say, "It has been considered as settled ever since the decision of the House of Lords in *Watts* v. *Crooke*, Show. Cas. in Parl. 108, that in succession of personal property relatives of the half blood, in equal degrees of cognation to the intestate, take equally with the relatives of the whole blood; and that they also take by representation where representation would be allowed among relatives of the whole blood in the same degree—that such was the rule in New-York." *Hallett* v. *Hare*, 5 Paige's Ch. 316.

This shows that in other States where the English statutes have in substance been reënacted, that no such doctrine as is contended for in the case under consideration has been thought of; hence it is more improbable that the New-Hampshire Legislature intended when they reënacted the statutes of Charles and James either to insert any new provisions therein, or create any new rule of descent, except in the single instance clearly defined, and the reason for which is clearly given.

Clark *v.* Pickering.

I am aware that some authorities in the Massachusetts Reports will probably be cited as bearing against us, but I confidently refer to the course of legislation, and to the decisions in that State, as supporting our views of the law relating to this case. In 4 Dane's Abr. 349, may be found the case of *Tenney and wife* v. *Sawyer and wife*, decided in Massachusetts, November 1781. In this case one of the points which directly arose, was whether children of a woman by her second husband could inherit from one of her children by her first husband, who had died under twenty-one and unmarried, real estate which had come to said child from its paternal grandfather; the court held that the half blood took. At the time this decision was made, the provincial act of the 4 W. & M. passed in 1694, and the provincial act of Queen Anne, passed 1710, were the statutes in force in Massachusetts governing descents. In the act 4 W. & M. the clause is precisely the same as that in the provincial act of New-Hampshire already cited. It was understood that the act of Anne did not alter the rules of descent provided by the 4 W. & M. 4 Dane's Abr. 537.

The next act in Massachusetts is that of 1783, and the words are precisely the same as those in an act of 1789. In *Mayo* v. *Boyd*, 3 Mass. 13, it was held that by the words "such deceased child" in the statute of 1783, is to be understood the child of any deceased father, and that the statute equally applied whether the estate comes from the father or from any other source. In *Runy* v. *Edmands*, 15 Mass. 291, it was held that this clause in the 4 W. & M. extended to estates descended from the mother as well as those derived from the father. In 12 Mass. 490, is to be found the case of *Sheffield* v. *Lovering*, and it is, to say the least of it, a curious one. A person dies intestate leaving a daughter his only heir, and his wife surviving him; his wife had been previously married, and had had four children; the daughter dies a few years after

her father, under twenty-one and unmarried; the question arises, does the mother inherit the whole of the daughter's property which she derived from her father, as next of kin, or does it descend to the four children of the half blood? The courts decide that it descends equally, or in equal portions to the mother and the four children of the half blood. This case as thus stated seems to be a direct authority in favor of the petitioners, but the whole reasoning of the court is directly the other way. They start with the assertion in substance that the acts of 4 W. & M., 9 Anne, and of 1783, are mere reënactments of the English statutes. By an acute and strained criticism upon the words "portion" and "share," they arrive at the conclusion that when a child dies under twenty-one and unmarried, his portion or share of his father's estate is to descend precisely as though the child had died while his father was living, the father's estate is to be considered as in the course of distribution, and a portion is to be newly assigned among his children; and at the end of the case the court arrive at a conclusion which is directly contrary to their reasoning.

Suppose a father dies leaving a child a week old, and that child lives until it is twenty years and eleven months old, is his estate to be considered in the course of distribution for that whole period? What kind of title has the child to his father's real estate? Is it one upon the condition that he live until he is twenty-one? If so, what right has the guardian to sell the same for the support of the minor? Or because the interest of his ward only shall require a sale, can the guardian give a title to the property? Certainly not, if his ward has only a conditional title which can be made perfect only by his arriving at the age of twenty-one years. Such doctrine leads to manifest absurdities. An attempt to put such a construction upon the English acts, would fail. The Massachusetts courts evidently get themselves into this dilemma by attempt-

ing to hold that the act of 1806 was only a revision of the preceding statutes upon the subject of descents, when in fact it introduces a new rule.

It says, such deceased child's share that came from its father or mother, shall descend in equal shares to its father's or mother's other children. This is language not to be found in the English statutes, or in any of the preceding Massachusetts statutes. If the preceding statutes are read thus, "the share or portion which such deceased child inherited from its father shall descend," etc., there is no ambiguity or uncertainty, and those acts so read, and the English, would be precisely alike. By so reading those acts, and considering the act of 1806 as introducing a new rule, this decision would be more conformable with itself, and not in its effect contradict the decisions in the 3d and in the 15th of Mass. Reports. The law in Massachusetts is now settled by the Revised Statutes, chap. 66, sec. 5, according to the rule we contend for. Rev. Stat. 414. The same is the rule in Maine. Rev. Stat. 379. And the rule as we contend it should be, is most distinctly established in this State, by the Revised Statutes, chap. 166, sec. 2; do. 331. This view of the law is strengthened by the following considerations:

Although by the English law the common ancestor be the root of the inheritance, yet it is not necessary to name him in making out the pedigree or descent. For the descent between brothers is holden to be immediate descent; and therefore title may be made by one brother or his representatives to or through another, without mentioning the common father. 2 Bl. Com. 226; 3 Cruise's Dig. 280–1; and also by the following:

The statute of Charles provides that no distribution shall take place until one year after the intestate's death; still it has been held that the next of kin has an interest vested in him before distribution, and if he die within the year after the intestate, his executor or administrator shall

have his share. 1 Com. Dig., Tit. Administrator, H; and cases there referred to.

The case of *Parker* v. *Nims,* 2 N. H. 460, is an authority in favor of our view of our case. In *McAffee* v. *Gilmore,* 4 N. H. 395, the court say that the share of a child dying under twenty-one and unmarried, is to be distributed in the same manner as it would have been had the child died before its father. This opinion is merely extra judicial. Neither this point nor any thing like it was then before the court. The decision of that case did not call for any reference to this point, nor for any such opinion as that expressed by the judge. It does not appear to have been well considered; no cases or authorities are referred to; it was no part of the argument in arriving at the decision affecting the rights of the parties in that cause. It has well been held that such an opinion is not a judicial opinion, and no more than a *gratis dictum.* See Ram. on Legal Judgments 37, and the cases there referred to.

*Hackett,* for the defendants.

GILCHRIST, J. Upon the decease of Theodore Furber in 1809 intestate, the real estate in controversy descended, by force of the laws which then existed, to his three children. Theodore, M'Lauren, and the defendant, Lydia.

On the 12th of May 1813 the first named of these children, Theodore, died unmarried and under the age of twenty-one years. And the question which has been chiefly discussed, relates to the effect of this event upon the one-third part which descended to him from his father. Whether it descended exclusively to M'Lauren and Lydia, children of his father, or was shared with them by Dorothy Folsom a sister of the half blood.

The statute of February 3d, 1789, regulating the descent of intestate estates, after providing that they shall descend in equal shares to the children of the intestate and such as

represent them, makes this further provision with respect to the share of any of such children as afterward die unmarried and under the age of twenty-one years, that it shall descend among the surviving brothers and sisters and such as represent them.

It is contended by the petitioners that by the term "surviving brothers and sisters," are embraced those of the half blood as well as others, in conformity with a construction given both here and in England to the statutes of distributions, as applied not only to cases of intestacy in general, but also to those in which the children of intestates die unmarried and of age, in the life time of the mother. *Jessopp* v. *Watson*, 1 Mylne & Keene 665.

By the statute of distributions (22 and 23 Car. 2), and until the statutes of 1 Jac. 2 provided that the brothers and sisters of this last named class of persons should be admitted to participate with the mother in the inheritance, the father, and in case of his death the mother as next of kin, succeeded to all of it; and the point decided in the case of *Jessopp* v. *Watson* was, that the statute of Jac. 2, in admitting the brothers and sisters of such adults to inherit in the life time of the mother, admitted them upon the same terms as after her death; that is without discrimination between the whole and the half blood.

But the provision of the statute which related to the case of one of the children of the intestate dying in infancy, in wholly excluding the mother from the inheritance, raised a very remarkable distinction between it and the case of an adult, in which she took the whole as next of kin. And we think it is very difficult to account for such a distinction, unless we suppose the intention of the statute to have been to confine the inheritance of minors to the blood of the ancestor from whom it was derived.

Such has been the construction of the statute in Massachusetts, where it has been held that the provision made

for the case of *one of the children* of the intestate dying in infancy, did not apply to a case of the death of an only child. *Sheffield* v. *Lovering*, 12 Mass. 490. The same construction appears to have prevailed in this State. *McAffee* v. *Gilmore*, 4 N. H. 391. It has been justly said in argument that the point did not arise in the case of *McAffee* v. *Gilmore;* but *Sheffield* v. *Lovering* is directly to the point that by the words " surviving brothers and sisters," are not intended those of the half blood, but only those who are of the line of the ancestor.

We are therefore of the opinion that by the term " surviving brothers and sisters," the statute was not intended to embrace a different class of persons from those indicated in the same clause by the words " children of the intestate." Laws N. H. (Ed. 1815) 207, and that the anomaly of excluding from the inheritance the mother who is the next of kin, and admitting those who can have no claim but through her blood, was not contemplated by the statute, and is not warranted by any sound rules applicable to the construction of it.

The conclusion therefore is, that upon the death of Theodore Furber the younger, unmarried and without attaining the age of twenty-one years, his *share* of the estate in question, derived by descent or intestacy from his father, descended among his surviving brothers and sisters who were the children of the intestate, and to no others.

Upon the happening of that event then, the estate became vested in equal moieties in M'Lauren and the defendant Lydia.

Upon the death of M'Lauren in 1818, of age and unmarried, his moiety would upon the authority of *Jessopp* v. *Watson* descend to the mother, to Lydia, and to the sister of the half blood, Dorothy Folsom.

The two parties last named then each acquired an interest in the inheritance to the extent of one third of one half, equal to one sixth.

Upon the death of the mother, her sixth descended in equal moieties to the defendant Lydia, and to Dorothy Folsom, who thereupon became owner of three twelfths or one fourth part, according to the theory of the defendants.

The petitioners, who with the minor Elizabeth Drew, represent the interest of Dorothy Folsom, are consequently entitled to take upon the partition, each one seventh of one fourth part of the estate in controversy.

*Decree accordingly.*